CRAWFORD et ux. v. FAHS, Collector of Internal Revenue.

Civil Action No. 831–J.

District Court, S. D. Florida, Jacksonville Division.

Dec. 4, 1945.

Harry T. Gray and Philip S. May, both of Jacksonville, Fla., for plaintiffs.

R. R. Reynolds, Jr., Sp. Asst. to Atty. Gen., Herbert S. Phillips, U. S. Atty., of Tampa, Fla., and Edith House, Asst. U. S. Atty., of Jacksonville, Fla., for defendant.

DE VANE, District Judge.

This case came on for trial, October 18, 1945, before a jury, upon the several issues raised by the pleadings in the case. Thereupon evidence was introduced and the Court being of the opinion that there was no issue of fact to be submitted to the jury and after argument upon the legal questions presented by the pleadings and evidence, instructed the jury to render a verdict for the plaintiffs and thereupon the jury rendered a verdict in the words and figures as follows:

"Verdict

"We, the Jury, find for the plaintiffs and assess their damages on Counts I and II of the Complaint at the sum of Five Hundred Eighty-five and 05/100 Dollars ($585.-05), with lawful interest thereon from August 24, 1944, and on Counts III and IV of the Complaint at the sum of Fifteen Hundred an 89/100 Dollars ($1500.89), with lawful interest thereon from August 24, 1944.

"So say we all.

"E. L. Patton
"Foreman
"Jacksonville, Florida, October 19, 1945."

Findings of Fact

1. The undisputed facts upon which the foregoing verdict was directed discloses that plaintiffs filed a joint income tax return, on Form 1040, with the defendant, as Collector of Internal Revenue for the State of Florida, on or before March 15, 1941, showing, among other things, that in the calendar year, 1940 (which is plaintiffs' tax year), they disposed of a capital asset held for more than eighteen months, but not more than twenty-four months, from which they realized a long-term capital gain in the sum of $9241.12, of which two-thirds was included in plaintiffs' net income for that year and all lawful taxes thereon were duly paid.

Also plaintiffs filed an income tax return, on Form 1040, on or before March 15, 1942, showing, among other things, that in the calendar year of 1941 they disposed of a capital asset held for more than twenty-four months, from which they real-

ized a long-term capital gain in the sum of $9427.46, of which fifty per cent was included in the plaintiffs' net income for said year and all lawful taxes thereon were duly paid.

2. The Collector of Internal Revenue subsequently ruled that the above income was not capital gains, but resulted from the disposal of property held by plaintiff, J. T. G. Crawford, primarily for sale to customers in the ordinary course of his trade or business. The Collector imposed an additional tax of $486.81 and interest in the sum of $98.24, or a total of $585.05 as an additional assessment for the tax year 1940, and an additional tax of $1314.-49 and $186.40 interest, or a total of $1500.-89 as an additional assessment for the tax year, 1941.

3. These taxes were paid under protest and claims for refund were duly filed with the Collector of Internal Revenue. The Collector not having paid the same and six months having expired, this suit was brought to recover the additional assessments made by the Collector and paid, under protest, by the plaintiffs.

4. The undisputed evidence in the case shows that in 1915 San Jose Company, a corporation, owned and subdivided into lots, a ninety acre tract of land lying South of South Jacksonville, Florida. Fifteen of the lots were shortly thereafter sold and conveyed. No other lots in this subdivision were sold until 1925, when all the remaining lots were sold in a block.

5. In August, 1925, J. T. G. Crawford, hereinafter referred to as "taxpayer," purchased an undivided one-sixth interest in the remaining lots. The other interests were, at the same time, purchased by City Realty Company, a corporation, one-third. T. J. Mason, one-third, and Arthur Finberg, one-sixth. Legal title to all the lots purchased was conveyed by lot and block numbers to said City Realty Company, which gave to San Jose Company a purchase money mortgage for $72,000, payable in four equal semi-annual instalments. The purchase price was $90,000. The agreement between the purchasers then was that the property be sold as a whole. City Realty Company held the legal title for the benefit of itself and the other purchasers.

6. Late in 1925 all the property so purchased was contracted to be sold to Acreage Investment Company, a corporation, but the sale was not consummated. Early in 1926 a contract was entered into with O. C. Griner, a real estate broker, under which the lots were offered for sale at retail on instalment contracts. In the following few months fifty-two lots were sold and conveyed.

7. In July, 1926, the taxpayer acquired from City Realty Company an additional one-ninth interest. City Realty Company became involved, and could not contribute its share of the payments accruing under the purchase money mortgage. To avoid difficulties with its creditors City Realty Company, in October, 1928, conveyed the legal title to Hammond Land Company, a corporation. The latter company never had any transactions concerning the lots, merely holding the legal title for the benefit of its owners.

8. In 1929 the taxpayer acquired an additional one-sixth interest from Mason.

9. In acquiring the additional interest from City Realty Company the taxpayer acted to protect his original investment. Payments accrued on the underlying mortgage and the purchase from City Realty Company enabled it to contribute its share of mortgage maturities which prevented foreclosure and consequent total loss.

In 1929 San Jose Company demanded payment of the balance then due on its mortgage. The taxpayer arranged for a loan, on the security of the mortgage, with which San Jose Company was paid, and in that manner the mortgage was extended.

10. When the mortgage was again called, all the owners, except the City Realty Company, were able and willing to pay off the balance of the mortgage. City Realty Company had then gone out of business and its interest had passed to The Florida National Bank of Jacksonville. The bank refused to contribute its share. The taxpayer and other owners were unwilling to carry the bank's interest and agreed among themselves that they would let the mortgage be foreclosed and undertake to bid the property in at the foreclosure sale. This was accomplished and title taken in the name of a corporation (Miramar Terrace Company) organized for the purpose. Miramar Terrace Company never held any other asset, and it was liquidated and dissolved as of December 31, 1938, when the legal title was conveyed to the owners.

11. Throughout the period from 1927 to 1937, inclusive, the property was held for sale as a whole with no thought of selling lots at retail. Late in 1938 Mr. Charles E. Commander, Jr., a building contractor and

real estate broker and developer, proposed to the owners that he would bear all the expense and perform all the work necessary to get the location approved for F.H. A. insured mortgages if the owners would grant him the exclusive right to buy, or to sell to others, all or any of the lots, at a 10% discount if he purchased for his own account, or 10% commission if he sold to others, according to a price schedule then agreed upon. On that basis he prepared the application and all required exhibits, paid all the expenses and performed all the work incident to the application. The application was eventually approved, subject to the conditions: (1) That water be made accessible to all lots on which applications for insured mortgages were to be made, and (2) that the streets must be hard surfaced in front of all such lots. The latter condition did not apply to the sixty-seven lots fronting on San Jose Boulevard, some of which were sold and the mortgages insured prior to the hard surfacing of any of the inside streets. The City of Jacksonville extended its water mains without cost to the owners. Mr. Commander secured bids on surfacing the short streets on which he offered lots for sale. The owners authorized the work and its cost was paid with money received from sales.

12. A power of attorney was given to Mr. Paul G. Baxter (who is employed in the taxpayer's law office) authorizing him to execute and deliver deeds and to receive and disburse all moneys received for lots.

13. Mr. Commander purchased for himself, and built homes upon, thirty-seven of the lots sold in 1940 and 1941, and substantially all the other lots, about 95%, were actually sold to builders, although some of the conveyances, at their request, were made to the persons who purchased completed homes from the builders. Such ultimate purchasers made temporary construction mortgages and authorized payment of the proceeds to the contractor.

14. The taxpayer has actively practiced law in Florida since June, 1906, and in Jacksonville since 1908, and has never since been engaged in any other business, profession, trade or calling, or had any financial interest in any business or trade In common with thousands of others he made some land speculations in the 1925-1926 boom. These lots represent one such speculation. Since then he has never purchased any real estate as an investment or as a speculation. He has never had a real estate broker's license. Other than the time occupied by purely legal work, for which he was paid customary fees by the other persons owning undivided interests in these lots, he gave no appreciable part of his time to any activity in connection with these lots. Mr. Commander had an option to purchase all or any number of the lots at fixed prices. The agreement permitted him to demand deeds for one or all or any intermediate number of lots at any time upon tender of the scheduled price.

Conclusions of Law

■ I. The Court has jurisdiction of the parties and the subject matter of this suit.

■ II. Taxpayer's activities in connection with these lands were not sufficient to constitute a trade or business during the years in question; and taxpayer did not during these years, 1940 and 1941, hold any of the property in said subdivision, primarily for sale to customers in the ordinary course of his trade or business.

III. All of the lots sold by taxpayer were capital assets and all of said lots sold in 1940, having been held for more than eighteen months but not for more than twenty-four months, the gain realized by taxpayer was a long-term capital gain, only 66⅔% of which should have been taken into account in arriving at taxpayer's taxable net income under the provisions of Section 117 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 117, as applicable to the calendar year, 1940; and all of the lots sold in 1941 having been held for more than twenty-four months, the gain realized by taxpayer was a long-term capital gain, only 50% of which should have been taken into account in arriving at taxpayer's taxable net income under said provisions of the Internal Revenue Code.

IV. The Collector improperly disallowed plaintiffs' claim for refund.

■ V. The Court finds and certifies that the acts complained of against the defendant, John L. Fahs, were done in the performance by him of his official duty as Collector of Internal Revenue, under the direction of his superiors in office, that there was probable cause for the acts done and, therefore, no execution shall issue on this judgment against such Collector.

VI. Judgment will be entered in accordance with these Findings of Fact and Conclusions of Law.