Louis C. Meyers and Ruth Meyers v. Commissioner.
Meyers v. Commissioner
Docket No. 3048-69.
United States Tax Court
T.C. Memo 1971-268; 1971 Tax Ct. Memo LEXIS 64; 30 T.C.M. (CCH) 1154; T.C.M. (RIA) 71268; October 19, 1971, Filed. Albert B. Arbaugh, for the petitioners. Frank E. Wrenick, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in Federal income tax for the joint returns of Louis C. and Ruth Meyers for the calendar years 1964 and 1965 in the amounts of $1,578.05 and $1,471.67, respectively. The issue is whether income recognized in those years resulting from sales of real estate constituted capital gain or ordinary income. Findings of Fact Some facts have been stipulated; the stipulation of facts and the exhibits attached thereto are incorporated herein by reference. *65 1155 Louis C. Meyers, hereafter Louis, and Ruth Meyers, hereafter Ruth, were husband and wife during the taxable years 1964 and 1965. Their principal residence was Canton, Ohio, at the time the petition was filed. Joint income tax returns were filed by the Meyers for the years in question with the district director of internal revenue, Cleveland, Ohio. Louis became a registered public accountant in 1929 and engaged in the practice of his profession in Canton, Ohio, and vicinity from that time through the years in question. During the period 1950 through 1965, Louis reported between $25,900 and $32,300 per year as gross income and between $13,200 and $17,700 as net income from his accounting practice. Petitioners sold various parcels of real property located in Canton, Ohio, during the years 1952 through 1965. Gain on the sales of these parcels was reported by petitioners on the installment basis. In 1964 and 1965, the years at issue here, there was reported gain from sales transactions occurring in each previous year back to 1952. In each instance in which the sale followed a holding period of over six months, the gain was reported and claimed on the tax return to be entitled *66 to long-term capital gain treatment. The long-term capital gain deduction at issue here is $3,540.14 for 1964 and $3,508.39 for 1965. A summary of sales for which gain was recognized in 1965 and the average amount of time for which the properties had been held prior to sale, is set forth below. (Sales of property held 18 months or more are set forth individually to avoid distortion.) *13 Transactions not at issue
Transactions at issue *13 (Property held less than 6 months:
(Property held over 6 months:
no long-term capital gain
long-term capital gain
deduction claimed)
deduction claimed)
Year
Average
Average
Total
of
Parcels
period
Parcels
period
sales
sale
sold
held
sold
held
per year
1952
3
11 months
3
1953
4
2 months
3
7 months
7
1954
1
4 months
2
9 months
3
1955
1
1.5 years
1955
2
7 months
3
1956
3
9 months
3
1957
1
1 month
1
2.7 years
1957
6
8 months
8
1958
2
2 months
5
7 months
7
1959
1
8.2 years
1959
8
7 months
9
1960
3
1 month
2
8 months
5
1961
8
8 months
8
1962
2
8 months
2
1963
1
1.1 years
1963
1
3.6 years
1963
1
5.8 years
3
1964
3
7 months
3
1965
1
7 months
1
*67 At the close of 1964, petitioners owned five rental dwellings and at the close of 1965, they owned six rental dwellings. The transactions described above involving both long and short term holding periods generally arose in the following manner. In 1950 the petitioners conceived and embarked upon a program which consisted of buying houses located in fringe and changing neighborhoods in the city of Canton, Ohio. Petitioners generally paid from $2,500 to $4,000 for each parcel of real estate purchased by them during the entire period from 1950 through 1965. They repaired 95 percent of the properties they purchased. These repairs included papering, painting, flooring, roofing, window repairs, and installation of window shades. Repairs on the properties were generally performed by a handyman regularly employed by petitioners. After repairs and rehabilitation, petitioners would rent these properties to tenants under the agreements containing an option to purchase, or under agreements which gave the tenant the preferential right to purchase after an "equity" had been built up through rental payment, and after the credit rating of the individual tenant had been established. If the tenant *68 or the preferential agreement holder proved to be reliable by keeping his rental payments current and his 1156 credit rating was proven to be satisfactory, petitioners and the tenant would enter into a land contract covering the property. When a land contract was entered into, the vendee was required to pay an interest rate, usually 6 percent, which was above the then prevailing mortgage interest rate. Petitioners further enhanced their rate of return by adjusting principal each half year rather than monthly as payments were made. Little or no down payment was required. The lessee-purchasers were given "credit" against the down payment for part of the rent they had paid during the seven to eight-month rental period prior to entering into the land contract. The land contracts provided in part that upon payment of one-half of the contract price, petitioners would issue a deed and take a mortgage back from the purchasers. Prospective purchases were located through Ruth's perusal of the daily newspaper listings of properties for sale. The decision to purchase was made jointly by Louis and Ruth. Both interviewed prospective tenant-purchasers, showed the houses to these prospects, *69 and checked the prospects' credit references. Both handled collection of rents. Ruth handled complaints of the tenants and purchasers, and Louis handled evictions of undesirable tenant-purchasers. In the course of the 16 years from 1950 to 1965, only five repossessions were necessary. Petitioners' intent at the time a house was first placed on the market was to find a person willing and able to purchase the property after a short rental period. Of the 65 sales of property being reported in petitioners' 1965 return, only six were held one year or more prior to the exercise of the purchase option. Ten involved an exercise of the option within the first two months following purchase by petitioners. The balance of the properties were sold under the option or preference arrangement after an average of between seven and eight months' retention by petitioners. The combined selling price of the 54 sales at issue taking place over the period from 1952 through 1965 equaled approximately $381,000. After deduction of costs and selling expenses of $228,000, the profit was $153,000, or 67 percent. Eleven transactions during the 1952 to 1965 period, not at issue here since they involved a holding *70 period of less than 6 months, resulted in only slightly less than a 50 percent profit. The profits on the 1964 and 1965 transactions were 99 and 104 percent, respectively. In comparison, the total interest income received on the contracts over the 1952 to 1965 period was approximately $162,000. The receipt of rent resulted in net rent income of $362.28 in 1964 and $338.38 in 1965. Opinion The issue is framed by sections 1202 and 1221, I.R.C. 1954.[1] The special tax treatment prescribed by section 1202 applies only to capital gains. Section 1221 defines capital assets and excepts from that definition those assets which are "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." A preliminary question must first be disposed of, that is, whether this dispute involves the capital character of only those sales made during 1964 and 1965, or whether this dispute encompasses the capital character of all sales made during the years 1952 through 1965 to the extent that gain from those sales was recognizable on the installment basis in 1964 and 1965, the two years for which the deficiency notice asserted additional tax owing. The deficiency *71 notice stated "that gains you realized from sales of real estate during 1964 and 1965" were ordinary rather than capital income; however, the computations in the deficiency notice show a disallowance of the section 1202 capital gain deduction taken in the years 1964 and 1965 relating to the total installment portion of all gains from sales in all years from 1952 through 1964 and 1965, respectively. The arguments of both parties were directed primarily toward the nature of sales occurring in 1964 and 1965, but some evidence is available from which the environment of the pre-1964 sales may be determined. Since deductions may be disallowed by the Commissioner without assigning any reason in the notice of deficiency for his action, Bard-Parker Co. , 18 T.C. 1255 (1952), affd. 218 F. 2d 52 (C.A. 2, 1954), certiorari denied 349 U.S. 906 (1955), the notice of deficiency must be said to have put into question the entire section 1202 deduction taken in the years 1964 and 1965. There is no reasonable claim of surprise here. We therefore conclude that the transactions at issue are those occurring from 1952 through 1965 for which a portion of 1157 the *72 gain was reported on the installment basis in the years 1964 and 1965. [2]
Turning now to the substantive elements of the case, petitioners have stipulated that the properties were originally rented out with an option to purchase or with a preferential purchase option being extended at that time to the lessee, and that it was their intent that the option be exercised. Petitioners in effect have stipulated that the property was held primarily for resale from the time it was purchased by petitioners. Thus, to prevail in this case, petitioners must show convincingly that although the property was held for sale, their activities did not constitute a trade or business since both a holding for resale and a trade or business are required by section 1221. George W. Mitchell, 47 T.C. 120, 126 (1966); Wellesley A. Ayling, 32 T.C. 704, 708 (1959). See Fahs v. Crawford, 161 F. 2d 315 (C.A. 5, 1947), affirming 65 F. Supp. 13 (S.D. Fla. 1945). Petitioners' assertion that they were not in a trade or business is based on the premise that the holding of the land contracts was *73 not a trade or business, and that the sales of real estate were merely incidental to the acquisition of the resulting land contracts. The argument is apparently that since petitioners desired a high rate of return on the mortgages and land contracts (and achieved it through use of a higher than normal interest rate and a practice of crediting principal every six months rather than monthly) the transactions of purchase and resale were merely incidental since mortgages and land contracts generally available from brokers did not offer as great a return. We are unable to accept this argument. At the outset it is clear from the facts that petitioners did not have such a singleminded purpose. The choice of houses to buy was framed not simply by a desire to achieve profitable mortgage transactions but also to realize a substantial gain on the resale of the property. Over 15 years petitioners averaged 66 percent return on their investments, most of which were held only slightly longer than six months. The profit on the 1964 and 1965 sales was 99 and 104 percent, respectively. These profits came about not as a happenstance result of any general market advances between the moment of purchase *74 and resale but rather because petitioners searched out in the "fringe" and "changing" and "depressed" neighborhoods properties which could be purchased cheaply and immediately resold. The profit was derived from resale following the repair of conditions present when the properties were purchased rather than from waiting while the general market increased the value of the property. The making of repairs immediately after purchase was a part of the well-thought-out plan of making a sizable profit on immediate resale. The price received on resale greatly exceeded that paid because of the payment terms offered the purchasers, the repairs made, and the economic realities of "changing neighborhoods." Louis' own terms when asked about the character of the neighborhoods in which their properties had been purchased were: the time we bought them, it was just about turning. Turning neighborhoods because people were anxious to sell and, of course, it gives us an opportunity to buy 'em at a pretty good price. This statement is a strong indication that petitioners set out to profit from the purchase and resale rather than simply obtain a high return land contract. In fact, most if not all of *75 the purchases made over the entire period were made only in neighborhoods in which such profits seemed to be available. However, even though we conclude that the properties were purchased and held with an intent to resell them and that the motive in doing so was not simply a step to the production of land contracts ostensibly held for investment, we must decide whether petitioners' activities constituted a trade or business. Petitioners suggest as controlling here cases involving a limited number of purchases and sales or real estate in any one year which have held that the respective taxpayers were not in a trade or business. Ralph J. Oace, 39 T.C. 743 (1963) (9-10 lots sold per year), and other unreported cases of this Court. These cases are of little help in this instance since in each case the subject property was purchased with an intent to hold it for investment purposes and the sales were essentially unsolicited or occurred because of a necessity to dispose of the property arising after its acquisition, facts not present in this case. It is clear in any event that these cases were not determined simply on the basis of 1158 the number of properties purchased *76 or sold in the year. As pointed out in Oace, supra, there is general agreement over the factors used in determining whether real property is being held for sale to customers in a trade or business. These factors include the purpose or reason for the taxpayer's acquisition of the property and in disposing of it; the continuity of sales or sales-related activity over a period of time; the number and frequency of sales; acquisition of adjacent land; the extent to which the taxpayer or his agents engaged in sales activity by developing or improving the property, soliciting customers and advertising; and the substantiality of the sales when compared to other sources of the taxpayer's income. In this case, almost all factors point towards petitioners' activity being a trade or business. The intent from the time of purchase to the time of disposition was to sell the property rather than retain it for gain through general market value appreciation over a substantial period of time. The time between acquisition of the property and the location of a renter-purchaser was short since it was stated that the properties were rented for seven or eight months and the total average *77 holding period was only slightly more than seven months. Nor is there evidence that the properties were rented first to one party and then sold to another, a possible indication that the properties were not initially purchased for resale. In most cases, the original renter was also the purchaser. Approximately 95 percent of the properties purchased over the 15 years from 1950 to 1965 were repaired shortly after their purchase, repairs which were implicitly anticipated at the time of purchase and aimed at an immediate increase in marketability of the property. We are unconvinced that these repairs were merely those minimal changes necessary to make an unmarketable investment marketable or the necessary steps in making the properties rentable. Nor were the sales isolated instances, another of the Oace case factors. Although there were only three sales in 1964 and one in 1965, these sales must be seen in context with several years of continuous activity. From 1952 through 1965, in only two years were there less than three sales, and the average number of sales per year over that 13-year period was nearly five. Both petitioners were actively engaged in acquiring and managing the *78 properties and in bringing about the sales. Ruth located potential purchases. Both inspected the properties and jointly decided whether or not to buy. Both interviewed prospective tenant-purchasers and showed the houses to the prospects. Both checked on the prospects' credit references and handled collection of rents and purchase contract payments. Ruth handled complaints and Louis evictions. This was a well-developed system and, in spite of Louis' full time job as an accountant, the activities clearly occupied a significant portion of time. It is not necessary to our conclusion that these activities represent the sole occupation of the taxpayers. Williamson v. Commissioner, 201 F. 2d 564 (C.A. 4, 1953), affirming 18 T.C. 653 (1952), certiorari denied 345 U.S. 970 (1953). Finally the income was not insubstantial when compared with other income being received. In 1964, the gain realized on sales occurring that year was $8,178 while income from the accounting business was $17,558 and interest income was $17,740. In 1965, these amounts were $3,869, $14,745, and $16,872, respectively. Petitioners' claim that their activities are no more a trade *79 or business than is the practice of regularly buying and selling securities is unfounded. In the investment in securities, the investor does not actively engage in sales activities and generally derives his gain from market conditions over which he has little control. Petitioners rely in this respect on Starke v. Commissioner, 312 F. 2d 608 (C.A. 9, 1963), reversing 35 T.C. 18 (1960), which discusses the analogy between the taxpayer's land transactions and the security market. The Starke opinion is distinguishable and does not affect our opinion here. In that case, there was a disposition of several parcels of a single acquisition made for investment purposes, whereas in this case the property was not purchased to be held for investment. Furthermore, the sales in Starke were the result of unsolicited offers and the property had been held for a substantial length of time, whereas in this case the petitioners have not shown the sales to have occurred in an unsolicited manner and it is clear that the agreement to sell, albeit conditional on the credit standing of the renter, arose very shortly after the acquisition of the property. Petitioners actively held these *80 properties for resale, as distinguished from passively holding the properties for gain to be derived 1159 from the increase of fair market value due merely to the passage of time. See Solly K. Frankenstein, 31 T.C. 431 (1958); George W. Longfellow, 31 T.C. 11 (1958); Albert Winnick, 21 T.C. 1029 (1954), affd. 223 F. 2d 266 (C.A. 6, 1955). Decision will be entered for the respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise noted.↩
2. The petition puts in issue the entire amount of the deficiency.↩