RALPH J. OACE AND ANN-MARI OACE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 87933, 808–62. Filed February 11, 1963.

*Robert Elliott, Jr., Esq.*, and *Harrison P. Dilworth III, Esq.*, for the petitioners.
*Marvin F. Peterson, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in the petitioners' income tax as follows:

| Year | Amount |
| --- | --- |
| 1956 | $1, 967. 76 |
| 1957 | 2, 029. 16 |
| 1958 | 1, 576. 82 |
| 1959 | 3, 639. 38 |

The only issue in these cases is whether the gains realized from the sales of real estate in the years 1956 through 1959 are taxable as capital gains or as ordinary income.

FINDINGS OF FACT.

Some of the facts were stipulated and they are found accordingly.

Ralph J. and Ann-Mari Oace, husband and wife, are residents of St. Paul, Minn. They filed joint income tax returns for the years 1956 through 1959 with the district director of internal revenue for the district of Minnesota, St. Paul, Minn. Ralph J. Oace will hereinafter be called the petitioner.

Petitioner received a degree in chemical engineering from the University of Minnesota in 1937. He is employed by Minnesota Mining and Manufacturing Co., St. Paul, Minn., and at the time of trial had been in that corporation's employ for 25 years. Petitioner's principal work with the corporation is in product development. He received a salary from his employer during the years 1955 through 1959 as follows: 1955, $8,160; 1956, $8,710; 1957, $9,310; 1958, $9,965; and 1959, $10,898. Ann-Mari Oace was a housewife throughout the years here involved. Petitioner and his wife have two children.

About 1954 petitioner had an equity of about $10,000 in his home and also owned stock of Minnesota Mining and Manufacturing Co. in the amount of about $4,500. Petitioner and his wife had been unsuccessfully looking for a new homesite of from 3 to 5 acres for about 10 years, and about 1954 they were planning an addition to their residence.

In 1954 petitioner tried to buy from 3 to 5 acres of undeveloped, wooded lake shore property a few miles from St. Paul, but the owner refused to sell such small tracts. The owner of the tract preferred to sell the entire 75-acre tract of lake shore property but finally agreed to sell a 20-acre tract to petitioner. An earnest money contract was executed in August 1954 covering the 20-acre lake shore tract which petitioner agreed to buy, and petitioner also received an option to purchase an additional 55 acres of adjoining property, with the provision that the seller would obtain a road easement over the 20-acre tract in the event the option was not exercised.

The seller then reduced the price of the entire 75-acre tract by $1,000 and the interest on the contemplated mortgage was reduced from 6 to 5 percent. These facts, plus petitioner's concern over the road easement over his 20-acre tract, persuaded petitioner to purchase the entire 75-acre tract, and on December 16, 1954, he purchased a 75.37-acre tract in Washington County, Minn., for $15,123.[1] Petitioner agreed to pay $4,500 cash and executed a promissory note in the amount of $10,500, with interest at 5 percent and monthly payments of $75. The note was secured by a mortgage on the property.

Petitioner then made the following purchases of undeveloped land, all of which adjoined the original 75.37-acre tract:

| Date | Acres | Purchase price |
|---|---|---|
| June 7, 1955 | 3 | $800.00 |
| Sept. 29, 1955 | 12.55 | 2,263.00 |
| Oct. 14, 1957 | 19.5 | 4,500.00 |
| Oct. 26, 1957 | 15 | 5,323.75 |

The 3-acre tract, which was contiguous to the 75.37-acre tract and very near petitioner's selected building site, was purchased to provide needed space for a roadway which would otherwise pass too close to the site of the new house. Also, a nursery of spruce and white cedar trees had been planted on this 3-acre tract some years back, and petitioner wanted to transplant some of these trees to his building site. This second purchase of the 3-acre tract also covered a portion of a

---

[1] There is a discrepancy of $123 between the sales price as stipulated and as it appears in the supplemental sales agreement dated December 16, 1954.

pond. The 12.55-acre tract covered the remaining portion of the pond and the remaining half of the above-mentioned nursery. The fourth purchase (19.5 acres) adjoined a State gravel pit on two sides and it was located between the gravel pit and petitioner's homesite of 20 acres. Petitioner planted about 10,000 pine trees on this 19.5-acre tract by hand.

Petitioner registered by Torrens proceedings in Washington County District Court, order and decree of registration, dated July 9, 1956, the property purchased by him prior to that date.

Petitioner cut an initial road through the brush and trees from the nearest road to his proposed homesite on a 20-acre portion of the original 75.37-acre purchase. This work was done by him on weekends and after his normal workday was over.

Petitioner subdivided the land purchased by him into three contiguous plots as follows: (1) Oace Acres, consisting of approximately 15 acres, was set out in a plat, dated and acknowledged September 30, 1955, and filed of record May 28, 1956, and consisted of 15 lots; this subdivision was platted from the 75.37-acre tract; (2) Oace Acres, Second Addition, consisting of approximately 40 acres, was set out in a plat, dated and acknowledged October 2, 1956, and filed of record October 9, 1956, and consisted of 31 lots; this subdivision was also platted from the 75.37-acre tract; and (3) Oace Acres, Third Addition, consisting of approximately 31 acres, was set out in a plat and acknowledged July 7, 1959, and filed of record July 13, 1959, and consisted of 25 lots; this subdivision was platted from the 3-acre tract (purchased June 7, 1955), the 12.55-acre tract (purchased September 29, 1955), and the 15-acre tract (purchased October 26, 1957). Oace Acres, Oace Acres, Second Addition, and a part of Oace Acres, Third Addition, were registered under the Torrens proceedings.

Petitioner constructed blade-finished roads at a cost of 35 cents per foot on the tracts purchased by him. East Oakdale Township, Washington County, Minn., accepted such roads and finished them as required by ordinance. Petitioner placed restrictive covenants on the tracts purchased by him, which placed a minimum value of $15,000 on buildings to be used for residential purposes.

Petitioner sold his first two lots from Oace Acres on June 2, 1955, to his father-in-law and to the latter's supervisor at their place of employment. When petitioner had originally purchased the 75.37-acre tract he had received oral assurance that the seller would release from the mortgage any land sold by the petitioner. After petitioner sold the first two lots, seller refused to make any partial releases under the mortgage. On September 21, 1955, the petitioner paid in full the promissory note given to the seller in the face amount of $10,500.

Petitioner drew his own plans and did the general contracting for his new home located on lakefront property that was part of the original 75.37-acre tract. He had originally planned to construct a house at a cost of about $22,000 to $24,000, but the final cost of the house, which was completed early in 1956, exceeded $60,000. Petitioner sold his old residence through a real estate agency.

During the years 1955 through 1959 the petitioner made the following sales from the three subdivisions:

| Year | Oace Acres | Oace Acres second Addition | Oace Acres third Addition | Gross receipts | Gain on sales |
|------|------------|----------------------------|---------------------------|----------------|---------------|
| 1955 | 9 | | | $15, 950 | $6, 719. 38 |
| 1956 | 5 | 4 | | 23, 150 | 12, 971. 08 |
| 1957 | 1 | 9 | | 17, 600 | 13, 207. 14 |
| 1958 | | 7 | | 16, 762 | 11. 278. 54 |
| 1959 | | 7 | 4 | 24, 950 | 19, 222. 32 |
| Total | 15 | 27 | 4 | 98, 412 | 63, 398. 46 |

Petitioner has never held a real estate license. During the years here involved the petitioner placed only one advertisement for his lots in a newspaper at a cost of approximately $5. Many of the purchasers of lots over the period here involved were friends of the petitioner and other purchasers learned about the lots through these friends. Sales of lots were made without the use of real estate agents and the property was not listed with any real estate agency. Except for one occasion, petitioner paid no commissions on sales. Petitioner generally showed lots to interested buyers on weekends. Petitioner had a collection of photographs of the area which he showed to prospective purchasers. Petitioner was at all times anxious to preserve the wooded aspect of his homesite and of the surrounding property.

Respondent determined that the gains realized by petitioner from the sale of lots in the years 1956 through 1959 were taxable as ordinary income.

OPINION.

The only question is whether the gains realized from the sales of lots in the years 1956 through 1959 were sales of property held primarily for sale to customers in the ordinary course of trade or business within the meaning of section 1221(1) of the Internal Revenue Code of 1954 [2] and therefore taxable as ordinary income.

Consideration has been given by the courts to several factors in deciding this question. These factors include the purpose or reason for the taxpayer's acquisition of the property and in disposing of it;

---

[2] All section references will be to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

the continuity of sales or sales-related activity over a period of time; the number and frequency of sales; acquisition of adjacent land; the extent to which the taxpayer or his agents engaged in sales activity by developing or improving the property, soliciting customers, and advertising; and the substantiality of the sales when compared to other sources of the taxpayer's income. *James G. Hoover*, 32 T.C. 618. No one of these factors is determinative, and the question must be examined in the light of all pertinent factors and particularly the facts of the individual case. *W. T. Thrift, Sr.*, 15 T.C. 366.

We do not believe that the petitioner's activities during the years before us in connection with this real estate constituted a trade or business. Petitioner and his wife wanted no more than a few acres for a new home on the lakeshore property and it was only after the owner of the 75.37-acre tract refused to sell her land in small portions that petitioner agreed to purchase as much as 20 acres. Subsequently, the owner reduced both the price on the entire tract and the rate of interest on the mortgage. These reductions in price, coupled with petitioner's fear of the road easement which the seller would have over the 20-acre tract and the fact that petitioner's attorney advised him that the entire tract would be "a very good investment," prompted petitioner to purchase the entire 75.37-acre tract. Thus the whole transaction grew in an unplanned manner out of an initial desire to buy a homesite that had great appeal for both petitioner and his wife.

After petitioner sold his first two lots to his father-in-law and to the latter's supervisor at work, more or less because (as petitioner testified) "We were a little bit obligated," petitioner learned that the seller of the 75.37-acre tract refused to make partial release of the mortgage, and petitioner was compelled to pay off the mortgage in full. This unexpected depletion of petitioner's finances, which were initially somewhat limited, made it necessary to sell off some portions of his original purchase. Again, as in the original purchase of the entire 75.37-acre tract, the move was made under a compulsion that could not be described as a business necessity. Petitioner testified that the monthly payments on the original mortgage would have been about $75 and that he contemplated liquidating his investment in the original tract slowly over the years to meet those payments, perhaps by selling a lot or two each year. But, as we have seen, petitioner was forced to pay off the entire mortgage almost immediately. Furthermore, the evidence shows that petitioner envisaged a new home costing about $24,000. He drew his own plans and did his own subcontracting, and it developed that the final cost of the house, as might be expected, was in excess of $60,000. Thus petitioner was under financial pressure to dispose of his property more quickly than he

had planned, all in furtherance of his original plan to secure a lakeside home.

Petitioner did not hold a real estate license, and none of the sales of lots were made through real estate agents. Nor were they listed with a real estate agency. Except for one $5 advertisement in a newspaper at one point, the petitioner made no effort to advertise the property. Sales were unsolicited and petitioner made no special effort to show interested buyers the property. Petitioner was a full-time employee of Minnesota Mining and Manufacturing Co. during this period. Prospective buyers were, at the start, friends of petitioner's, and they in turn told others about the property. Petitioner did not keep an office or any telephone listing for this venture and any activity in connection with the sale was minimal in nature.

We do not believe that the sale of about 9 or 10 lots each year over a period of 5 years is so frequent or consistent as to indicate, under these facts, a trade or a business. In *Frieda E. J. Farley*, 7 T.C. 198, this Court pointed out "that the cases which have applied this test to real estate transactions involved elements of development and substantial sales activity which are essentially lacking in the instant case." We have commented on the lack of sales activity on petitioner's part. His development of the property was equally minimal.

Petitioner constructed blade-finished roads on the property at a cost of 35 cents per foot, and these roads were accepted and finished by the local township. Petitioner at first started to build a road by himself, and it was only after he encountered difficulties that he engaged an outside contractor. There were no other improvements and petitioner's development activities in connection with his property were limited to the plats and to the Torrens proceedings.

We think the case of *Wellesley A. Ayling*, 32 T.C. 704, is somewhat analogous to the one before us. In the *Ayling* case the taxpayer, in order to acquire a desired house, was compelled to buy the surrounding undeveloped property. He admitted that at the time of purchase his financial circumstances dictated disposal in the most expeditious manner possible. He subdivided the unwanted part, improved it to some extent, and sold it in lots, that being the best way he could devise to protect the value of his homesite. We held that, under those facts, the sale of 13 lots over a period of 4 years did not constitute a trade or a business.

Petitioner's additional purchases of property after the initial purchase of the 75.37-acre tract, as well as the restrictive covenants placed upon all of the tracts, were motivated, in large part, by his desire to preserve the wooded and secluded nature of their 20-acre homesite, as well as the remainder of this area. All of the subsequently purchased tracts were adjacent to the original tract. One

of these purchases (about 20 acres) was to provide a screen between petitioner's property and a State gravel pit; another purchase (about 3 acres) was to alleviate a road bottleneck on petitioner's original tract.

We hold, on the basis of the entire record, that the lots sold by petitioner in the years before us were not held primarily for sale to customers in the ordinary course of a trade or business.

*Decision will be entered for the petitioners.*