Auda C. Brodnax v. Commissioner.
Brodnax v. Commissioner
Docket No. 2692-68.
United States Tax Court
T.C. Memo 1970-164; 1970 Tax Ct. Memo LEXIS 195; 29 T.C.M. (CCH) 733; T.C.M. (RIA) 70164; June 22, 1970, Filed Oscar Nipper, 7654 Park Place Blvd. Houston, Tex. for the petitioner. Robert J. Curphy, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's *196 income tax for the calendar years 1962 and 1963 in the respective amounts of $6,314.43 and $4,453.93. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision whether certain tracts of land located in Westchester Estates were held by petitioner primarily for sale to customers in the ordinary course of his trade or business so that the gain from the sales thereof would be taxable to him as ordinary income. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner who resided in Houston, Texas at the time of the filing of the petition in this case, filed with his wife, Bonnie Brodnax, joint Federal income tax returns for the calendar years 1962 and 1963 with the district director of internal revenue, Austin, Texas. On July 21, 1958, Oscar Nipper, J. H. Nipper, and J. D. Nipper purchased approximately 40 acres of land near Pearland in Brazoria County, Texas. In January of 1959, J. H. Nipper sold his interest in this acreage to Oscar Nipper and J. D. Nipper. On February 15, 1962, J. D. Nipper, who is Oscar Nipper's father, conveyed his interest in the property to Oscar Nipper. *197 Petitioner is an architect. He had lived in Pearland, Texas, a town of about 1,000 inhabitants, for a number of years prior to 1962. Petitioner had known Oscar Nipper's father for many years and Oscar Nipper was petitioner's attorney. Petitioner prior to 1962 had purchased jointly with another a 23-acre tract of land and a 5-acre tract in the area of Pearland, and had also purchased a 16-acre tract in that area. Petitioner was holding these parcels of land as an investment since Pearland was a growing area and property values were increasing. J. D. Nipper had been quite ill about the time he transferred his interest in the 40 acres of land to Oscar Nipper and needed the money he would receive from the sale of his interest in the land. Petitioner either learned of the situation or was approached by Oscar Nipper with respect to purchasing the one-half interest in the tract which had been owned by J. D. Nipper. Petitioner entered into a contract dated March 20, 1962, with Oscar Nipper providing for the purchase by petitioner of an undivided one-half interest in the 40 acres, but with Oscar Nipper retaining title in his own name. Petitioner has no recorded interest in the property although *198 he and Oscar Nipper after March 20, 1962, each owned an undivided one-half interest in the property and agreed to share equally in the profits and losses arising in connection with the property. The reason petitioner left record title to the property in Oscar Nipper's name was for convenience in conveying title to the property should they decide to sell it. During 1962 Oscar Nipper and petitioner established a bank account, requiring the signatures of both, in the name of Westchester Estates to be used in making payments in connection with the 40 acres of property for items such as mortgage interest and taxes. There is no assumed 734 name registration or certification under the name of Westchester Estates. J. D. McGuff, Jr., an associate in petitioner's architectural firm, had asked petitioner on several occasions to sell him land near petitioner's home in Pearland in order that he might build a home in the area for his family. Petitioner because of his business relationship with McGuff had considered such a sale to be inadvisable and therefore had refused to sell such land to McGuff. At some time prior to March 21, 1962, petitioner asked McGuff to draw a preliminary lay-out *199 of the 40 acres dividing it into tracts of approximately 1 acre each. On March 21, 1962, petitioner and McGuff drew up such a preliminary layout, sketching a road through the property as an access to the back tracts which did not border on either of the public roads which bounded the property on two sides. The road was sketched in a curved fashion to run through the property from one of the public roads to the other. McGuff laid out 37 tracts of one acre or slightly more each. This preliminary layout was never recorded or filed with the County. When McGuff sketched the preliminary layout, he marked the tracts numbered 5, 6, and 7, which were on the curve of the sketched road, and asked petitioner if he might purchase them with the idea of building a home for himself and his family on one or two of the tracts. Petitioner told McGuff to see Oscar Nipper. McGuff on March 27, 1962 purchased the three tracts consisting of approximately 4 acres. Later in 1962, McGuff's father bought two tracts of approximately 1 acre each and his aunt, whose name was Ramano, bought two tracts of approximately 1 acre each. The deeds from Oscar Nipper conveying the property to McGuff and his father and aunt *200 were in metes and bounds although the tract numbers as shown on the layout were referred to as "lot" numbers in the deeds also. McGuff's deed provided that the three lots were to retain their separate identity and were to be used only for residential purposes. The deed also provided that McGuff was to build a house on "lot 6" containing not less than 1,650 square feet of living space and be constructed of not less than 75 percent brick. Petitioner and Nipper laid out a black top access road without curbs or gutters in the approximate area as it was shown on the preliminary layout. The road is marked as a private road. There is a drainage ditch with pipe conduits installed at either end of the road. This is in accordance with the requirements of the county of Brazoria at all driveways, roadways, crossings and intersections. There is no recordable subdivision plat filed on the property and none has been submitted to the County Planning Commission. No utilities are furnished to any of the property holders by Nipper or petitioner. The electric company provides service to the property, with installation being at the request and expense of the owner of the lot who is building thereon. *201 Landowners also drill their own wells and place their own septic tanks. On April 6, 1962, a consulting engineer by the name of Jack C. McKnight completed a partition survey of the original 40-acre tract consisting of a survey of the outside boundary lines and an interior survey. This survey is not a recordable plat and does not contain any dedicated rights-of-way or easements of any kind. At the suggestion of McKnight the interior tracts were staked out at the time the survey was made in order to expedite the partitioning and to cut down on cost as compared to later staking of the tracts. The expense of making a recordable subdivision plat except for drafting costs would not have been much greater than the expense of the partition survey made by McKnight. Petitioner was approached by several real estate agents who requested that they be permitted to handle sales of the property in the 40-acre tract. Petitioner referred these agents to Oscar Nipper. One of the agents who was referred to Nipper was told by Nipper that if he sold some of the tracts of land he would be paid a commission but that he would not be given an exclusive right to sell or any type of commitment that the owner *202 would sell any particular piece or parcel of land. During the years 1962, 1963, and 1964, this agent arranged sales of 21 tracts in 14 separate purchasing transactions. These 21 tracts were all the sales from the 40 acres during the years 1962, 1963, and 1964 except for the sales directly by Nipper to McGuff, his father, and his aunt. The agent made no sales from the 40 acres after 1964. This agent from time to time placed 2 X 3 feet "for sale" signs on some of the tracts carrying his name. Occassionally another realestate agent placed a 2 X 3 feet "for sale" 735 sign on a tract, giving his name, and occasionally a prior purchaser put a similar sign on his property offering it for resale. Petitioner and Nipper had an 8 X 10 feet sign erected on the property carrying the name "Westchester Estates." The 28 tracts of land were sold to the persons and on the dates as follows: Purchaser
Purchase date
J. C. McGuff, Jr. (3 tracts)
March 27, 1962
Romano (2 tracts)
April 14, 1962
J. H. Davey [1]
April 23, 1962
J. H. Davey [1]
April 28, 1962
Rufus Smith [1]
June 1, 1962
H. L. Cole [1]
September 21, 1962
J. D. McGuff, Sr (2 tracts)
October 1, 1962
Homer A. Dalton [1] (3 tracts)
June 8, 1963
Tom Zambon [1] (3 tracts)
June 12, 1963
Valrie G. Thornton [1] (2 tracts)
July 8, 1963
Tom Zambon [1] (2 tracts)
September 6, 1963
Homer A. Dalton [1]
September 9, 1963
Cecil M. Weatherspoon [1]
September 25, 1963
Milton C. Winkler [1]
January 29, 1964
Thomas J. Clark [1]
September 15, 1964
W. Alton Hill [1]
September 15, 1964
Buissons [1]
(Date unknown 1964
Jesse Ray Turk [1]
(Date unknown) 1964
*203 Deeds to these properties were from Oscar Nipper to the purchaser and contained substantially the same type description and provisions as did the deeds to McGuff and the deed to McGuff's father. Oscar Nipper's law firm was paid for drawing the deeds, the payment being made from the "Westchester Estates" bank account. Receipts from sales were deposited into the "Westchester Estates" bank account. During 1962 petitioner and Oscar Nipper made payments in connection with the 40 acres for survey expense in the amount of $405, for work done and materials supplied by M & M Construction Company in building the road in the amount of $3,000, and for grading work on the road in the amount of $281.96. An additional expense was incurred for culvert pipe in the amount of $108.53. This $3,795.49 was the total amount spent for any form of improvement to the property. Petitioner and Nipper paid commissions to the agent who made some sales of the property out of the 40 acres in the amount of $420 in 1962 and $1,847.50 in 1963. The 40 acres of land was originally financed by Nipper on a long-term basis with interest at 5 percent per annum being the only payment required *204 for a period of 10 years. Thereafter principal was payable at $1,000 per year. The purchasers of the property had an option to pay off the principal sum earlier if they so desired. At the date of the trial petitioner and Nipper still owned approximately 10 to 12 acres of the original 40 acres. This is the portion located nearest the intersection of the two public roads bordering the property on two sides. Petitioner has received offers to purchase this property almost every week but he has refused to sell. A proposed freeway has been planned to run by the corner of the property. At the time petitioner acquired his interest in the land, it was expected that the freeway would be located in that vicinity and this fact influenced petitioner to purchase the property. Petitioner does not have a real estate license and has never held one. He has never held himself out to the public to be in the real estate business. Petitioner has never met any of the purchasers of property from the 40 acres aside from McGuff with whom he works and McGuff's father whom he met once in McGuff's office. Petitioner on his Federal income tax return for 1962 reported "Gross income" from his portion of receipts *205 from sales of property in "Westchester Estates" of $1,843.30 and for 1963 reported long-term capital gain from sales of such property in the amount of $3,764.09. Respondent in his notice of deficiency made, among others, the following adjustments in petitioner's income as reported: It is determined that ordinary income from the sale of lots was overstated by $1,247.31 in 1962 and understated by $13,933.80 in 1963. These amounts are taken into account as ordinary income instead of long-term capital gains because the land was acquired and held primarily for sale in the ordinary course of business. At the trial counsel for the parties informed the Court that they were not in disagreement as to the amount of petitioner's gain on the sales in either year or the amount which constituted short-term capital gain, should the Court sustain petitioner's contention that the sales were of a capital asset. Opinion Section 1202, I.R.C. 1954, [1] provides in the case of individuals who do not use the alternative tax computation provided for in section 1201 for a deduction of 50 percent of the excess of net long-term capital gain over net short-term capital loss. 736 Section 1222(3) defines *206 "long-term capital gain" as "gain from the sale or exchange of a capital asset held for more than 6 months." Section 1221 [2] defines capital asset by exclusion, that is, by enumerating those assets which are not capital assets. Property held by a taxpayer primarily for sale to customers in the ordinary course of his trade or business is excluded by section 1221 from the definition of capital asset. Whether real property is held primarily for sale by a taxpayer in the ordinary course of his trade or business is a factual issue which has been involved in numerous cases. In Malat v. Riddell, 383 U.S. 569 (1966), *207 the Supreme Court defined the word, "primarily" used in section 1221(1) to mean "of first importance" or "principally." Therefore, in the instant case we must determine from all the evidence whether petitioner's holding of his interest in the 40-acre tract was "principally" for sale to customers in the "ordinary course of his trade or business." If we conclude that petitioner's holding of his interest in the 40-acre tract was as an investment and for sale, then his interest in the property is a capital asset unless the holding for sale is "of first importance." If we conclude that petitioner's activities in connection with the property were not sufficient to constitute a "trade or business" his interest in the property is a capital asset. The ultimate issue is the purpose for which the property was held at the time of sale. Among the factors which have been considered as relevant in determining a taxpayer's purpose in holding property are: "(1) The purpose for which the asset was acquired; (2) the frequency, continuity, and size of the sales; (3) the activities of the seller or those acting for or in concert with him in the improvement and disposition of the property; (4) the extent *208 of improvements made to the property sold; (5) the proximity of sale to purchase; and (6) the purpose for which the property was held during the taxable years." Robert W. Pointer, 48 T.C. 906, 915-916 (1967) affirmed 419 F. 2d 213 (C.A. 9, 1969). In the instant case petitioner's original intention in purchasing the property was to hold it in anticipation of the increase in value of the land upon the building of a freeway in the immediate vicinity. This intention was never abandoned and at the date of trial petitioner was still holding the portion of land that the freeway would touch. From these facts it might be concluded that petitioner's holding of his interest in the 40 acres as an investment was at least of equal importance as was his holding any portion of it for sale. However, we need not decide this question since for reasons hereinafter set forth we do not consider that petitioner was in the "trade or business" of selling this property in the years here in issue. The record is not clear as to why petitioner had his associate, McGuff, sketch a preliminary layout of the 40 acres. This fact is an indication that petitioner was at least considering *209 from the time he acquired the property selling individual tracts rather than selling the entire property at one time. However, it is clear that the reason petitioner and Nipper made the first sale of property to McGuff was because McGuff asked to buy the property. Moreover, petitioners did not themselves actively solicit purchases from any persons. The real estate agent who made all sales of property in the 40-acre tract which were made, except to McGuff, his father and his aunt, approached petitioner and Nipper requesting to be permitted to make the sales. Petitioner personally performed no activity with respect to the property other than assisting McGuff in the sketching of the preliminary layout. Nipper was a little more active in the handling of the property in that he made the arrangements with the real estate agent and drew the deeds. The only improvement to the property was the access road which was necessary if McGuff was to use the property he had purchased. Both the lack of any active seeking to make sales of the property and the nominal improvements to the property negate the conduct of a "trade or business" with respect to the property by either petitioner or Nipper. *210 This case is quite similar to Ralph J. Oace 39 T.C. 743 (1963) in which 737 we held that a taxpayer who acquired approximately 100 acres of property with the intent of building his own home on 20 acres and holding the balance as an investment did not hold the property for sale to customers in the ordinary course of his trade or business. In that case as in this, the first sales were to persons closely connected with the taxpayer who desired to buy the property. In that case as in this, the fact that the first sales were made led to the further sales so that the transaction "grew in an unplanned manner." In Ralph J. Oace, supra, we stated that we "do not believe that the sale of about 9 or 10 lots each year over a period of 5 years is so frequent or consistent as to indicate, under these facts, a trade or business." In the instant case there were sales, unsolicited by petitioner, of 28 tracts to 15 individuals over a 3-year period, which tracts were unimproved except for a minimal access road. In our view, under the facts here present such sales are not so "frequent or consistent" as to constitute a trade or business. We hold that petitioner's gain from *211 the sale of tracts from the 40 acres is gain from the sale of a capital asset. Decision will be entered under Rule 50. Footnotes
1. Sales made by agent.↩
1. All references are to the Internal Revenue Code of 1954. ↩
2. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *↩