ROBERT L. HAMILTON and MARY E. HAMILTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hamilton v. Commissioner
Docket No. 7280-71.
United States Tax Court
T.C. Memo 1974-93; 1974 Tax Ct. Memo LEXIS 226; 33 T.C.M. (CCH) 463; T.C.M. (RIA) 74093; April 17, 1974, Filed. William F. Kolbe, for the petitioners. Robert F. Brunn, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1968 in the amount of $325.54. The issues for decision are (1) whether petitioners realized ordinary income or capital gain on the sale of a lot in the taxable year 1968, and (2) whether there is properly before us an issue as to petitioners' disclaimer of any right to add to the basis of the lot sold the prorata cost of substantial improvements, thereby reducing the basis of the property and increasing the gain from its sale and, if so, are petitioners entitled to make a disclaimer. The resolution of the first issue is dependent upon whether the lot sold by petitioners in 1968 was property held for sale to customers in the ordinary course of petitioners' trade or business within the meaning of section 1221(1), I.R.C. 1954. [1]
FINDINGS OF FACT Some *228 of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, were residents of Racine, Wisconsin, at the time their petition in this case was filed. Petitioners filed their 1968 Federal income tax return with the district director of internal revenue in Milwaukee, Wisconsin. In 1943, Robert L. Hamilton (hereinafter petitioner) was a vice-president in charge of sales for the Dumore Company, an electrical machine manufacturer in Racine, Wisconsin. Petitioner has been employed by the Dumore Company since 1934 and is presently its president and chairman of the board. In the spring of 1943, petitioner and his wife were looking for lake frontage property to buy for their personal residence. They happened upon some vacant land fronting on Lake Michigan, and by contacting the adjoining property owner, Jacobsen, obtained the name of a realtor, Elmer McCarrol, who had the listing on this property. Petitioner called McCarrol and learned that the property had approximately 630 feet of frontage on Lake Michigan and that the owner wanted to sell the entire parcel of land at one time for the cash price of $17,750. Petitioner contacted two acquaintances *229 of his, George Gillett and George Shoup, to inquire if they might be interested in joining with him in the purchase of this property. The three men examined a plat of the property divided into three approximately equal parcels and decided that George Shoup would acquire parcel one, George Gillett would acquire parcel two, and petitioner would acquire parcel three. The plat they examined also depicted property adjoining the rear of the lake frontage property which was designated "Parcel A, 10.08 acres," but they did not at that time discuss the possible acquisition of the adjoining property. Petitioner was unable to construct a personal residence on the lake front property he acquired until 1947 due to the shortage of building material during World War II. Petitioner commenced construction of a home on this property in 1947 and completed his home in 1949. Gillett built a residence on his parcel in the early 1950's. Shoup built a beach house on his property, and subsequently sold the property to another individual who then resold it to an individual named Waisman. Waisman constructed a permanent residence on the property in the late 1950's. A short time after petitioner's purchase *230 in 1943 of the lake frontage property, McCarrol contacted him to inquire as to whether he and his adjoining property owners would be interested in buying Parcel A, the 10.08 acres in back of their land, for $1,800. After discussing this offer, the three men in 1944 decided to and did purchase the additional property. By 1966, Shoup no longer held an interest in this adjoining property. In 1966 petitioner and Gillett were co-owners of Parcel A. In 1944 the three purchasers of Parcel A did not discuss the possible future subdivision of the property. The primary reason that the three land-owners of the lake front property purchased Parcel A was so that they would own half of the private access road from the highway to their lake front property, thereby being assured of continued ingress to their residences. After purchase of the property, the three landowners and their families used the property generally for recreation, for horseback riding, hunting, picnics, and ice skating. Petitioner and his co-owners prior to 1967 did not improve the property and it remained in its original state for over 20 years after their purchase of it. Petitioner's property was in the Village of *231 Wind Point, a suburb of Racine. Petitioner was one of the founders of the Village. When petitioner first moved into the area, it was farmland. The Village was formed in the early 1950's and ordinances were passed to prohibit the use of firearms and the stabling of horses on property located in the Village. During 1966 and 1967, water lines, sanitary sewers, electrical and telephone cables, and gas lines were required by the Village of Wind Point to be installed along the rear of the three lake frontage properties, following the path of a newly constructed paved road which severed the three residential properties from the back 10 acres. In 1966, petitioner and his co-tenant were contacted by L. L. Freeman, a real estate broker and developer (hereinafter Freeman), who was president of L. L. Freeman, Inc., mortgage bankers and realtors. Freeman invited a number of landowners in the area of petitioner's home to a meeting at which he presented a drawing to illustrate his conception of the possible subdivision of a large amount of property in the Village of Wind Point, including Parcel A. This drawing had been made by John H. Nielsen & Associates, an architectural firm headed by John *232 H. Nielsen who was also the Village engineer during the years 1966, 1967, and 1968. On September 20, 1966, Freeman wrote a letter to petitioner and Gillett with regard to the disposition of Parcel A which they jointly owned. In this letter Freeman offered two alternate propositions, the first being the purchase by his company of the entire tract of land for $11,000 an acre, or a total of $110,000, on a land contract which provided for a cash downpayment of $2,000 payable at the time of the closing and the balance of $108,000 to be paid $10,000 annually beginning October 1, 1967, for 10 years thereafter and $8,000 the 11th year, plus interest on the unpaid balance computed at the current prime rate each year. Freeman's alternate proposal read as follows: We will develop and sell this property as your agents supervising the plan, layout, all necessary engineering, the installation of all utilities and roadwork according to the estimate given you by John H. Nielsen, Consulting Engineer of Racine, according to his letter of September 8th, 1966, copy of which is in your hands. For this supervision, promotion and sales, there will be a charge of 20% of the selling price of sales. *233 We would want an exclusive listing effective as of the date of execution and extending for a period of 2 years after completion of the subdivision development as indicated by the approval of the final roadwork by the Village of Wind Point. These terms would apply whether your 10 acre parcel would be developed individually or in conjunction with other properties owned by Mr. Joseph Waisman, John or Oscar Jacobsen, and/or others. Since the Village of Wind Point will shortly be installing water mains along presently existing roadways and it would be desirable to be able to include water line installations in the roads of the new development, time is of the essence. Consequently, we urge an early determination of your program so we could make every effort to get the necessary work completed this year of 1966. Petitioner did not consider the terms of Freeman's first alternative to be attractive. He was unwilling to sell the property on the basis of a land contract. He discussed the second proposition with Gillett and Waisman and they agreed to allow Freeman to develop the land. The development was to be called the Hunt Club East Subdivision and will hereinafter be so referred *234 to. Petitioner and Gillett signed an agreement with L. L. Freeman, Inc., giving that company the exclusive right to secure purchasers for the property in the Hunt Club East Subdivision "at prices for each building site to be agreed upon between broker and respective seller" and "at terms to be agree upon by respective Sellers." The agreement provided for payment to L. L. Freeman, Inc., of "a commission of twenty percent (20%) of the sale price, which will include promotional and supervisory costs." This agreement was dated November 25, 1966, and was effective as of that date. It was on the form approved by the Wisconsin Real Estate Brokers' Board for "Vacant Land Exclusive Listing Contract" and contained in addition to the printed matter typed specific provisions. It provided that this "listing contract shall expire 2 years after completion of the subdivision development as indicated by the approval of the final roadwork by the Village of Wind Point." This exclusive listing contract is the only formal written agreement between petitioner and L.L. Freeman, Inc., with respect to the 10 acres in the Hunt Club East Subdivision. Before signing this contract petitioner submitted it *235 to his lawyer for review. Petitioner's lawyer raised certain questions and petitioner, by letter dated December 19, 1966, transmitted to L.L. Freeman, Inc., a copy of the letter he had received from his lawyer with respect to the contract. Freeman, as president of L.L. Freeman, Inc., replied to petitioner's letter dated December 19, 1966, stating in part as follows: * * * as stated, I believe that this is the second step. The first, is to get the Listing Agreement signed and more as an expression of serious intent rather than anything else. Your next step, once the Listing Agreement is signed, is to reduce the general terms to specific ones to which all, I am sure, will agree. My comments and suggestions for that [sic] items the [sic] Tony raises are as follows: 1. Time limitation. Tony did not read the complete sentence on the expiration of the listing. That stated "two years after the completion of the subdivision development as indicated by the approval of the final road work by the Village of Wind Point." We would rush through this work as fast as possible. But municipalities are notroiously [sic] lax in granting final approval. We cannot begin to actually *236 sell by delivery of title until that approval is obtained in writing. Since we will be using the Village engineer for all our work, I can see no reason why the Village should delay their approval. But we are perfectly willing to add "or three years from date, whichever time is shorter." 2. What is the promotional and supervisory work which we are supposed to do? That consists of developing, with the engineer, the final satisfactory plat plan and obtain the approval of the required bodies, including the Village of Wind Point, the planning department of the City of Racine and the Wisconsin Industrial Commission. It will also include obtaining approval of the engineering department of the North Cape Sanitary District and the Town of Caledonia; obtaining bids for the sewer work, any additional water mains which may be necessary and see that proper gas lines and underground electrical service installations are completed on time. And also seeing that all of this is properly supervised by our engineer. Only then can the main promotional work of putting these on the market, in an appropriately sophisticated manner, be started for maximum sales at maximum prices. Actual utility installation *237 and engineering costs will be advanced by us and periodically billed to the owners as per actual invoices. We believe that this is the best way for keeping the owners at extreme arms length from the development so there will be no question of their non-involvement in it, thus permitting the net income to be taxable at the capital gain rate rather than as real estate or ordinary income. * * * 4. We will suggest prices at which to first offer each lot. Both Hamilton and Gillett should agree to parcels within the Hamilton-Gillett property and Waisman should agree to the price of the lots on his property. Hamilton-Gillett should know of the price of the Waisman properties and vice versa. The prices for all parcels should be in harmonious relation with each other. From time to time, we will suggest price revisions if warranted. These usually have been upward. 5. Subdivision restrictions are usually quite uniform in wording. The only differences are in set-backs, side yard requirements, minimum square foot area and/or price requirements of dwellings, etc. etc. Recommended restrictions will be submitted to all three owners, who will have to sign the restrictions as owners, *238 before recording to run with the land. After receiving Freeman's offer, petitioner spent $450 for a survey of his property in 1966. Once development commenced, petitioner paid $14,081.33 in development costs in 1968 as his share of the expenses relating to water mains, sanitary sewers, storm sewers, road grading, signs and electrical work done on the property. Freeman told petitioner and Gillett that he contemplated subdividing the land into 15 to 18 good building sites which would sell at an average price of $24,000 a lot. On December 20, 1967, petitioner, Gillett, and Waisman filed restrictive covenants on the Hunt Club East Subdivision. The restrictions contained therein specified that the lots were to be used for residential purposes only and permitted no building other than a detached single-family dwelling not more than 2-1/2 stories in height above grade level. The agreement additionally provided as follows: No building, including fencing, shall be erected, placed or altered on any building site in this subdivision until the building plans, specifications, and site plans showing location of such building have been approved in writing by a majority of a committee *239 composed of L. L. Freeman, Robert L. Hamilton, Dr. George Gillett, Joseph Waisman, all residing in the Village of Wind Point, serving for a term of seven (7) years from December 1, 1967, or their authorized representatives, or successors, for conformity and harmony of external design and as to location of the building with respect to property, building setback lines and grade levels, as well as complying with all regulations of the Village of Wind Point. This committee was not required to function or even meet formally at any time up to the time of trial of this case since the only house built in the subdivision was built for promotional purposes and the architectural sketches of that house were shown at a promotional cocktail party attended by all members of the committee, each of whom approved of the house. L.L. Freeman, Inc., obtained bids from various contractors for the grading and construction of roads and installation of sanitary and storm sewers and water mains in the Hunt Club East Subdivision. L.L. Freeman, Inc., after consultation with the engineer, Nielsen, let the contracts from the bids without consultation with the owners of the land, but Freeman gave periodic *240 reports to the owners as to the progress of the work and billed petitioner and each of the other owners for his prorata share of the development costs. Petitioner paid these bills when received. Petitioner also kept informed as to the progress of the improvements being made, since he passed by the subdivision often in the course of travel to and from his own home which was in the vicinity of the subdivision. Petitioner was aware of the promotional activities being carried on in connection with the subdivision by L.L. Freeman, inc., such as the European road signs placed throughout the subdivision, brochures distributed, and newspaper advertising in Milwaukee and Southeastern Wisconsin newspapers and in magazines. Petitioner did not take part in or pay for any of these promotional activities. The roadwork in Hunt Club East Subdivision was approved by the Village of Wind Point in the latter part of 1968. As part of the promotion of Hunt Club East Subdivision, Freeman arranged for a builder, Fleishman, to construct an attractive house on a lot which Fleishman agreed to purchase in the subdivision, with Freeman to arrange the financing of both the lot and the house. Freeman negotiated *241 with Fleishman for a contract of sale of a lot in Hunt Club East Subdivision providing for a downpayment of $1,000 to petitioner and $1,000 to Gillett in cash, and a second mortgage of $21,000 to them, a first mortgage to be given to Freeman in connection with obtaining a construction loan for the house. The contract further provided that if the house Fleishman intended to build was not sold by him within 90 days after its completion, the amount which Fleishman would owe to petitioner and Gillett each would be reduced from $10,500 to $9,750. When Freeman discussed the sale of the lot to Fleishman on the basis of this contract with petitioner and Gillett, neither of them was willing to accept a second mortgage and only agreed to do so on condition that Freeman guarantee the mortgage, which Freeman did. Petitioner and Gillett signed the contract of sale of the property to Fleishman in December 1968. Architectural drawings of the house to be built by Fleishman were shown at the promotional cocktail party given by Freeman and attended by petitioner, Gillett and other owners of land in the vicinity. The Fleishman house was never completed. Freeman paid petitioner and Gillett the *242 amount due on their second mortgage and he resold the property to a doctor in a later year. The only other lot sale in Hunt Club East Subdivision was to an individual named Russo in 1972 for $15,000. Freeman discussed this price with petitioner and Gillett who reluctantly agreed to it. In the latter part of 1972 Freeman was notified by petitioner and Gillett that the listing contract would no longer remain in force. Petitioner had an adjusted cost basis of $3,631.80 in his one-half interest in Hunt Club East Subdivision as of September 20, 1966. Petitioner is a graduate accountant and reads current tax and accounting publications. Petitioner understood certain principles governing the platting and development of subdivisions and had a good idea of land values in the Village of Wind Point. Petitioner and Gillett retained legal title to the lot located in Hunt Club East Subdivision which was sold in 1968 each paying his share of the real estate taxes thereon until the time of its sale. Petitioner and Gillett continued thereafter to retain legal title to the other lots in Hunt Club East Subdivision and to pay the taxes thereon. On his income tax return for 1968 petitioner *243 reported income from wages of $108,024.67 and other income of $14,775.26, which included $578.42 reported as long-term capital gain from the sale of the lot to Fleishman. Respondent determined that the amount of gain was $663.47 and that the lot was property which petitioner held primarily for sale to customers in the ordinary course of business, so that the gain realized from the sale was taxable as ordinary income. Respondent computed the $663.47 gain as follows: Basis in Hunt Club East Lots Cost of Land 1943
$ 2,750.00
Storm Sewer - 1961
881.80
Survey Cost - 1966
450.00
Development Costs - Freeman 5/68
5,615.59
Development Costs - Freeman 10/68
7,723.29
Development Costs - Freeman 10/68
678.15
Culverts - Schultz Trenching 11/68
64.30
Total Basis
$18,163.13 Lot
Sales Price
Percent of Sales Price
Adjusted Basis 1
$ 18,500
6.4125
$ 1,164.71
2
20,000
6.9324
1,259.14
3
19,000
6.5858
1,196.19
4
19,500
6.7591
1,227.66
5
24,000
8.3189
1,51 0.97
6
24,000
8.3189
1,510.97
7
20,000
6.9324
1,259.14
8
23,000
7.9723
1,448.02*
9
25,000
8.6655
1,573.93
10 25,000
8.6655
1,573.93
11
21,500
7.4523
1,353.57
12
25,000
8.6655
1,573.93
13
24,000
8.3189
1,510.97
Totals
$288,500
100.0000
$18,163.13
*244 Computation of Gain from Sale of Lot Sales Price
$10,750.00
Less: Cost of Lot
$1,448.02*
Plus: Exp. of Sale
2,169.71
3,617.73
Gain on Sale
$ 7,132.27
Percent of Profit
66.3467
Payment Received in 1968
1,000.00
Taxable Gain in 1968
$ 663.47
Petitioners, in an amendment to petition, added the following as paragraph 5 of their petition: 5. The Petitioners herewith disclaim and renounce any right they might otherwise have to add to the basis of the property here in question the costs of substantial improvements made to that property with the result that the gain from the sale of that property will be increased regardless of whether this Court should determine that gain to be capital gain or ordinary income. Petitioners changed their prayer in the amendment to petition to read as follows: Wherefore, your Petitioners pray that this Court hear this proceeding and determine that they are liable only for additional income taxes for the year 1968 attributable to an increase in the capital gains from the sale of the property here in question resulting from a decrease in basis equal to the amount of substantial improvements attributable to *245 that property. Respondent contends that no issue is properly before us as to a disclaimer by petitioners of addition to basis of their property and that for the Court to allow petitioners to change the basis in their property in this manner would be improper. OPINION Section 1221 defines a capital asset as property held by a taxpayer, whether or not connected with his trade or business, with certain exclusions, one of which is property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. [2]
*246 The contention between the parties in this case centers on whether the lot sold by petitioner in 1968 was a capital asset or was excludable from the definition of the term "capital asset" because of being held by petitioner "primarily for sale to customers in the ordinary course of his trade or business." As the Court stated in Malat v. Riddell, 383 U.S. 569, 572 (1966), the purpose of the provisions of section 1221(1) "is to differentiate between the "profits and losses arising from the everyday operation of a business' * * * and "the realization of appreciation in value accrued over a substantial period of time"." The Court in Malat held that the word "primarily" as used in the statute means "of first importance" or "principally." The facts in the instant case show that there had been appreciation in value of petitioner's property over the 20 years that it had been held. The offer made to petitioner by Freeman to purchase this property was for an amount many times the amount petitioner had paid for the property. On the other hand, the record likewise shows that petitioner hoped to obtain an even greater amount for the property by taking the second alternative offered *247 to him by Freeman and disposing of the property after it was subdivided into lots. It is therefore necessary that we analyze all of the facts here present to reach a conclusion of whether, using the definition of "primarily" as laid down in the Malat case, petitioner held the lot he sold in 1968 primarily for sale to customers in the ordinary course of his trade or business. As we have pointed out in numerous cases, this is a question of fact which must be determined from the record in each particular case. We have from time to time listed factors to be considered in reaching a conclusion as to whether property was held by a taxpayer primarily for sale to customers in the ordinary course of his trade or business. These factors include the reason for the taxpayer's acquisition of the property, the continuity of sales over a period of time, the number and frequency of such sales, whether the taxpayer has acquired adjacent land, the extent to which the taxpayer or his agent engaged in development of the property or in sales activity, and the substantiality of the amount realized by the taxpayer *248 from sales of property as compared to his other sources of income. Ralph J. Oace, 39 T.C. 743 (1963). No one of these factors is determinative but the ultimate factual conclusion must be reached from a consideration of all the pertinent facts in the particular case. Koch v. United States, 457 F.2d 230 (C.A. 7, 1972). In this case most of the factors are such as to indicate that petitioner was not engaged in a real estate trade or business, the only contra indication being the subdivision of the property. Petitioner relies primarily on the case of Voss v. United States, 329 F.2d 164 (C.A. 7, 1964), in support of his contention that his own activity with respect to the Hunt Club East Subdivision was so limited that none of the factors pointing toward his being in a trade or business is present in this case. Petitioner contends that his situation, as was that of the taxpayer in the Voss case, is one of a mere passive investor in land turning his land over to a realtor in order that a capital asset might be liquidated. The taxpayer in the Voss case was a dentist who owned a farm near Racine, Wisconsin, which he had acquired in the late *249 twenties and early thirties. In 1954 he contacted a realtor to have him sell the farm tract and the realtor suggested the development of a subdivision.The taxpayer in the Voss case then turned the entire project over to the realtor who paid all development costs as well as all advertising costs, reimbursing himself for the development costs out of the sale of lots. The Voss case relied on our holding in Estate of William D. Mundy, 36 T.C. 703 (1961). The Mundy case involved taxpayers who inherited property and turned it over completely to a real estate developer to dispose of. The real estate developer subdivided, developed, and sold the property without any participation by the taxpayers, and from the facts there present we concluded that the lots sold in the years there in issue by the taxpayers were not held primarily for sale to customers in the ordinary course of their trade or business. However, the Voss case does not, as petitioner contends, stand for the proposition that a realtor cannot be acting as an agent for a taxpayer in the development of real estate when he lets contracts for work which the taxpayer has agreed should be undertaken at the taxpayer's *250 expense and attempts to sell lots at prices which the taxpayer participates in setting. This is clearly shown by the following statement (329 F.2d at 166): A taxpayer need not personally conduct real estate sales to be in the business; he may act through agents. Moreover, a taxpayer may not insulate himself from the acts of those whose efforts are combined with his in an endeavor to make a profit. But the cases which adhere to these principles do not stand for the proposition, as the Government argues, that because the agent is in the real estate business, the agent's business is necessarily imputed to the taxpayer. Rather, the question is "whether the activities of the taxpayer, including the activities of an agent that can properly be imputed to the principal, taken together with all other relevant factors pertaining to the taxpayer's relationship to the property, place the taxpayer in the real estate business so that the property in question can be said to be held by taxpayer for sale to customers in his business." Estate of Mundy, 36 T.C. 703, 712 (1961). *251 This distinction was brought out in Hansche v. Commissioner, 457 F.2d 429 (C.A. 7, 1972), affirming a Memorandum Opinion of this Court. The facts in the instant case are substantially different from those in the Voss and Mundy cases. We have set the facts forth in our findings. On the basis of this record, we conclude that Freeman was acting as petitioner's agent in arranging for the laying out of streets and lots and the placing of sewers and water mains in the Hunt Club East Subdivision and was also acting as petitioner's agent in promotional activities with respect to that subdivision. We therefore, in considering the factors indicating whether petitioner held the lot he sold in 1968 for sale in the ordinary course of his trade or business, must consider these activities as if they were carried on by petitioner. Hansche v. Commissioner, supra.However, under the holding in the Voss case and our holding in the Mundy case, we are not to consider the fact that because petitioner's agent, Freeman, was in the real estate and mortgage banking business, it follows that petitioner should likewise be considered to be in this trade or business. Considering *252 all of the facts in this record, we conclude that petitioner did not hold the lot he sold in 1968 for sale in the ordinary course of his trade or business. The record shows that petitioner had made no sale of real property prior to his sale of this lot. It shows that this lot was part of the property which petitioner had held for 20 years for personal use and decided to sell only when a road placed by the city at the back of his original lot cut this property off from his original lot and made this property no longer suitable for the recreational activities for which he had originally purchased it. The record shows no other purchase or sale of property by petitioner except for his personal residence. Petitioner was approached by Freeman with the proposition that he sell the property which would be cut off from the property on which his home was located. The amount petitioner received from the sale of the lot was small indeed as compared to his income from other sources and petitioner was engaged in a full-time occupation as a corporate executive. These are all factors which we have in various cases held to indicate that property sold by a taxpayer was not held for sale in the *253 ordinary course of the taxpayer's trade or business. Wellesley A. Ayling, 32 T.C. 704 (1959); Estate of William D. Mundy, supra; and Ralph J. Oace, supra.
The fact that improvements are made to property which are substantial in relation to the original price of the property has been considered as an indication of a taxpayer's being engaged in a trade or business. S. O. Bynum, 46 T.C. 295 (1966). However, improvements to property cannot be considered out of context with the activities that follow the making of the improvements. In S. O. Bynum, supra, and other cases which stress the improvements made to property, there have been a number of sales made by the taxpayer of lots in the subdivision while the improvements were being made or at least immediately following the making of the improvements. It has been the combination of the improvements and sales of the property which has tended to tip the scales toward the taxpayer being engaged in the real estate business. See George W. Longfellow, 31 T.C. 11 (1958). *254 Many cases place far greater stress on the "continuing, substantial and frequent sales of property that is subdivided" than on how substantive are the improvements made to the property. Nadalin v. United States, 364 F.2d 431, 438 (Ct. Cls., 1966). The cases are clear that property which has been subdivided may still be held for investment and remain a capital asset. W. T. Thrift, Sr., 15 T.C. 366 (1950). In W. T. Thrift, Sr., supra, we held that the subdivision of property followed by sales of the lots to six builders did not constitute a trade or business of the taxpayer. In the instant case the one sale made by petitioner in 1968 was to a builder for promotional purposes at the insistence of his agent with the payment for the property guaranteed by his agent. Freeman, petitioner's agent, and Fleishman, the purchaser of the lot, had entered into an agreement between themselves with respect to the building of a promotional house on the property with Freeman bearing the financial risk of the enterprise. Freeman even guaranteed the second mortgage *255 that petitioner and Gillett took on the property. No other sale of property was made from Hunt Club East until 1972. Therefore, to whatever extent frequency of sales is a factor to be considered it is clearly a factor favoring petitioner's view of the transaction here involved. In Robert W. Pointer, 48 T.C. 906, 917 (1967), affirmed 419 F.2d 213 (C.A. 9, 1969), we stated as follows with respect to the weight to be given to the "frequency" and "continuity " of sales: The decided cases are of little aid in establishing the "frequency and continuity" of sales sufficient to constitute a regular course of business. A total of 7 sales during the tax year was held sufficient in George J. Wibbelsman, 12 T.C. 1022 (1949), while the sale of 95 subdivided lots in 2 tax years was held insufficient in Fahs v. Crawford, 161 F.2d 315 (C.A. 5, 1947). Rather than apply a mechanical test, one approach is to determine whether the taxpayers were engaged in activity commonly associated with a particular business. See 3B Mertens, Law of Federal Income Taxation, sec. 22.138, p. 850; Frieda E. J. Farley, 7 T.C. 198 (1946). The sales *256 in West Point Park were continuous from 1959 to 1966. They were also made as frequently as the price range established by petitioner would permit. This was entirely compatible with a business plan to maintain high property values and the "exclusive" character of the development. In the Pointer case as noted in the above quotation, the sales though not numerous in the years there in issue had begun 2 years prior to the years in issue. Here, no sales were made from the time petitioner entered into the contract with Freeman in 1966 until the one isolated sale over 2 years later. Freeman testified that he did not consider the property ready for sale until the road-work was accepted by the Village of Wind Point in late 1968. However, the indication from the record is that lots could have been sold prior to this time had any offers to purchase been received. Petitioner's testimony shows that he was not anxious to sell and preferred to hold the property until such time as its value increased to the sales prices he and Freeman had set. His actions also support this testimony in that shortly after he let Freeman persuade him in 1972 to take a reduced price for a lot he canceled Freeman's *257 contract. While no one factor is determinative of the issue herein, the fact that only one sale was made over a period of about 6 years and that sale was made mainly for the benefit of petitioner's agent who as a mortgage banker was to finance the building of a promotional house, weighs strongly toward the conclusion that petitioner was not in the trade or business of selling real estate. Considering all the facts here present we conclude that petitioner did not hold the lot he sold in 1968 primarily for sale to customers in the ordinary course of his trade or business and that therefore he properly reported the gain on the sale of that lot as capital gain. Petitioners, in support of their allegation in their amendment to petition that they "herewith disclaim and renounce any right they might otherwise have to add to the basis of the property here in question the costs of substantial improvements made to that property," contend that they have shown by the testimony of a certified public accountant that if the costs of water mains, storm sewers, sanitary sewer, roads, grading, and underground electrical installation were removed from the total cost of improvements, the result would *258 be an increase in gain from the sale of the lot in 1968 from $7,132.37 as set forth by respondent in his notice of deficiency to $8,136.21, thereby resulting in a reportable gain in 1968 from the sale of the lot of $757 rather than the $663.47 as determined by respondent. [3] *259 Respondent next contends that since petitioners specifically state that they are not claiming that section 1237[5] is or should be applicable to the year 1968 which is the only year in issue here, there is no issue properly before us with respect to whether petitioners should be able to disclaim or renounce their right to have added to the basis of the property sold the cost of substantial improvements. To the extent that petitioners are in effect asking us to determine whether or not in future years *260 they would be entitled to apply the provisions of section 1237 to the sale of the lots, respondent is correct in his position. As we pointed out in Olga B. Roderick, 57 T.C. 108, 112-113 (1971), this Court is without jurisdiction to render an advisory opinion or declaratory judgment with respect to matters which might arise in future years. *261 Petitioners, however, state that they are not asking that we make any determination with respect to their rights under section 1237 either for this year or for future years. If we accept this statement of petitioners as representing their position and determine the proper basis of the property in petitioners' hands in 1968 without consideration of the provisions of section 1237, it is apparent that respondent properly computed petitioners' basis in the property sold in 1968 by including in that basis the cost of improvements made to the property. Although petitioners have not attempted to file an amended return claiming the benefits of section 1237, in effect they are attempting to have their tax liability for the year 1968 computed as if they had done so and have us pass upon whether they would be entitled to do so. Petitioners cite, in support of their position that they have a right to disclaim, the case of Keeler v. Commissioner, 180 F.2d 707 (C.A. 10, 1950), affirming 12 T.C. 713 (1949). In that case the Court did state, as petitioners point out, that when a petition is filed by a taxpayer in this Court from a determination of deficiency by the *262 respondent, this Court has jurisdiction to determine the correct deficiency even though the amount is greater than that found by the Commissioner, and that the provision limiting the jurisdiction to make a determination to situations where a claim is asserted by the Commissioner at or before the hearing or a rehearing "is obviously for the protection of the taxpayer and would not prevent him from insisting upon a correct determination of the deficiency regardless of the immediate results." Even though this language is contained in the opinion of the Appeals Court in the Keeler case, the Court affirmed our holding that a taxpayer who had properly claimed a war loss on his 1942 return could not, without the consent of the Commissioner, withdraw the war loss deduction which was properly claimed so that he would not be required to include in his gross income in a later year the amount of recovery of the war loss. In our opinion in Frank W. Keeler, 12 T.C. 713, 716 (1949), which was affirmed by the Tenth Circuit in the case on which petitioners rely, we stated as follows: It is our opinion that petitioner's contention is untenable. We believe that, in accordance with section *263 127 of the Internal Revenue Code, (I.R.C., 1939) the war loss involved was properly deductible by petitioner in the year 1942. The question he raises is an attempt not merely to arrive at a different computation of his tax for 1942, but also an effort to change the basis on which his computation of tax for a subsequent year will be made. If he is permitted to reopen his taxable year 1942 for the purpose of affecting his tax liability for other years, the result will be a departure from the rule of strict annual accounting and will place an unnecessary obstacle in the orderly administration of our tax laws. We think that, in the interest of the regular and ascertainable flow of revenue, petitioner's election to take the war loss deduction in 1942 must be treated as binding. We so hold. * * * In affirming our opinion the Tenth Circuit stated to this same general effect as follows (180 F.2d at 710): We are not dealing with a situation where the taxpayer desires to correct errors or miscalculations in his original return. Here it is sought to change the basis upon which taxes for different years will be computed. It is a case where the election made by a taxpayer *264 later resulted in a disadvantage to him. He cannot at this late date disavow that election. Although the situation here differs from that in the Keeler case in that petitioners now wish to elect to disclaim the substantial imporvements to their property as part of its basis rather than to disavow a proper election previously made to take a deduction, the legal conclusions in the Keeler case are equally applicable here. There is nothing in this record showing, and in fact petitioners do not contend, that they did not properly in their return for 1968 increase the basis in the lot they sold by an allocable portion of the expenses of the improvements made to that lot. Petitioners do not contend that respondent did not properly make adjustments in his notice of deficiency to the basis as determined by petitioners and that the basis as determined by respondent is improper. Therefore, in this case there is no issue before us as to the proper method of computing the basis of petitioners' property for the year 1968. If petitioners' attempt to disclaim should be considered to raise an issue as to the proper basis of the property sold, from the facts in this record we conclude that respondent *265 has properly computed the basis of the lot sold by petitioners in 1968. Any decision as to petitioners' right under section 1237 to disclaim the addition to basis for the improvements made to their property will have to await such time as an issue as to the propriety of a disclaimer under that section is properly before this Court. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954. ↩
2. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; ↩
3. The gain of $757 was computed by the accountant as follows: Cost of Land
$ 2,750.00
Storm Sewer 1961
881.80
Survey 1966
$450.00
$ 4,081.80
Improvements - Substantial
$12,592.38
Non-Substantial
1,488.45
14,081.33
$18,163.13
Sales price
$10,750.00
Cost of Lot
$ 444,08
Expense of Sale
2,169.71
2,613.79
$ 8,136.21
Percent of gain
75.7%
Payment received in 1968
$ 1,000.00
Capital Gain - 1968
757.00
Petitioners state that they do not consider it material to the issue that they give an explanation of why they wish to adjust the gain from the sale of their lot in such a manner as to increase the amount of their tax for 1968, but proceed to offer in their brief the following explanation: The reason the Petitioners do not want any tax benefit from the costs of these improvements is that to obtain such a benefit for any year would permanently bar them from electing under Section 1237, Internal Revenue Code of 1954, for any future year in which they might otherwise qualify under and need the relief of that Section. The Petitioners are not asking this Court to determine or speculate as to whether they might in some future year be entitled to the benefits of Section 1237 nor are the Petitioner's [sic] seeking an application of Section 1237 for the year here involved as clearly the required election was not made with the 1968 return. (Joint Exhibit 1-A) The petitioners request that the Court permit them to reduce their basis without any reference whatsoever to Section 1237. The issue before this Court now is whether the Petitioners may voluntarily waive an addition to basis subsequent to the filing of the return but prior to a final adjudication of tax liability for the year involved. Respondent argues that the adjustment claimed by petitioners would result in an increased deficiency and the Court is not entitled to make the adjustment sought by petitioners since under the provisions of section 6214(a) a determination of deficiency in excess of that determined by the notice of deficiency may be made by this Court only if it is claimed by the Commissioner at or before a hearing or rehearing. SEC. 6214. DETERMINATIONS BY TAX COURT. (a) Jurisdiction as to Increase of Deficiency, Additional Amounts, or Additions to the Tax. - Except as provided by section 7463, the Tax Court shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any additional amount, or addition to the tax should be assessed, if claim therefor is asserted by the Secretary or his delegate at or before the hearing or a rehearing. [4]↩ Since we have concluded that petitioners correctly reported the gain from the sale of the lot as the gain from the sale of a capital asset, it appears that the increase in the gain from the sale of this lot from $663.47 to $757, as petitioners now argue the gain should be, would not result in an increased deficiency, so this point made by respondent is not now pertinent to this case. 5. SEC. 1237. REAL PROPERTY SUBDIVIDED FOR SALE. (a) General. - Any lot or parcel which is part of a tract of real property in the hands of a taxpayer other than a corporation shall not be deemed to be held primarily for sale to customers in the ordinary course of trade or business at the time of sale solely because of the taxpayer having subdivided such tract for purposes of sale or because of any activity incident to such subdivision or sale, if - (1) such tract, or any lot or parcel thereof, had not previously been held by such taxpayer primarily for sale to customers in the ordinary course of trade or business (unless such tract at such previous time would have been covered by this section) and, in the same taxable year in which the sale occurs, such taxpayer does not so hold any other real property; and (2) no substantial improvement that substantially enhances the value of the lot or parcel sold is made by the taxpayer on such tract while held by the taxpayer or is made pursuant to a contract of sale entered into between the taxpayer and the buyer. * * * * * * (b) Special Rules for Application of Section. - * * * (3) Necessary improvements. - No improvement shall be deemed a substantial improvement for purposes of subsection (a) if the lot or parcel is held by the taxpayer for a period of 10 years and if - (A) such improvement is the building or installation of water, sewer, or drainage facilities or roads (if such improvement would except for this paragraph constitute a substantial improvement); (B) it is shown to the satisfaction of the Secretary or his delegate that the lot or parcel, the value of which was substantially enhanced by such improvement, would not have been marketable at the prevailing local price for similar building sites without such improvement; and (C) the taxpayer elects, in accordance with the regulations prescribed by the Secretary or his delegate, to make no adjustment to basis of the lot or parcel, or of any other property owned by the taxpayer, on account of the expenditures for such improvements. Such election shall not make any item deductible which would not otherwise be deductible. ↩